**Katherine MILTIER, Administratrix of the Estate of Gwendolyn Miltier, Plaintiff–Appellant,**

v.

**Charles BEORN; Leon Dixon; Robert W. Fry; Reva H. Barker; Mary Spencer; Ann F. Downes; Shirley Burton; Ray Kessler; Edward W. Murray; John Doe, Warden, & other unknown named Wardens of Virginia Correctional Center for Women, individually and officially, Defendants–Appellees,**

and

**Kay Upton; Allyn R. Sielaff, Defendants.**

**Katherine MILTIER, Administratrix of the Estate of Gwendolyn Miltier, Plaintiff–Appellee,**

v.

**Shirley BURTON; Ann F. Downes, Defendants–Appellants,**

and

**Leon Dixon; Robert W. Fry; Reva H. Barker; Mary Spencer; Kay Upton; Ray Kessler; Edward W. Murray; Allyn R. Sielaff; John Doe, Warden, & other unknown named Wardens of Virginia Correctional Center for Women, individually and officially; Charles Beorn, Defendants.**

**Nos. 89–2635, 89–2637.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1989.

Decided Feb. 20, 1990.

See also, D.C., 696 F.Supp. 1086.

James Michael Hanny (Susan C. Minkin, Christopher V. Tisi, and Michelle A. Parfitt, Ashcraft & Gerel, Washington, D.C., on brief), for appellant.

Frank B. Miller, III (M. Pierce Rucker, John B. Catlett, Stacy P. Thompson, Sands, Anderson, Marks & Miller, on brief), Michael Paul Falzone (Paul A. Simpson, Brian K. Jackson, Hirschler, Fleischer, Weinberg, Cox & Allen, Robert S. Brewbaker, Jr., Brewster S. Rawls, Browder, Russell, Morris & Butcher, Rosewell Page, III, Mary M.H. Priddy, McGuire, Woods, Battle & Boothe, and D. Patrick Lacy, Jr., Kathleen S. Mehfoud, Hazel, Thomas, Fiske, Beckhorn and Hanes, P.C., Richmond, Va., on brief), for appellees.

Before HALL, PHILLIPS and CHAPMAN, Circuit Judges.

PHILLIPS, Circuit Judge:

Gwendolyn Miltier, an inmate at the Virginia Correctional Center for Women (VCCW), was found dead next to her bed in the prison clinic after having suffered an acute heart attack. Katherine Miltier (Miltier), administratrix of her daughter Gwendolyn's estate, brought this 42 U.S.C. § 1983 action against defendant doctors, nurses, wardens, and prison administrators (collectively, defendants), asserting that defendants violated Gwendolyn's eighth amendment right to be free from deliberate indifference to a serious medical need during her incarceration at VCCW. Miltier also alleged pendent state-law claims under Va.Code § 8.01–50. On cross motions for summary judgment, the district court dismissed Miltier's § 1983 claim against all defendants and declined to exercise pendent jurisdiction over Miltier's pendent state-law claims. Additionally, the district court denied Rule 11 sanctions as requested by the defendant wardens. We affirm in part, reverse in part, and remand.

I

In reviewing the district court's grant of summary judgment for the defendants, we examine the facts in the light most favorable to Miltier. *See Sosebee v. Murphy,* 797 F.2d 179, 181 n. 2 (4th Cir.1986). On January 9, 1985, Gwendolyn received a five-year sentence for operating a motor vehicle after having been declared an habitual offender, and was incarcerated at the Portsmouth City Jail. During her incarceration, Gwendolyn complained of chest pain, blackouts, and shortness of breath. A jail physician, Dr. Charles Barclay, diagnosed Gwendolyn as suffering from angina and prescribed a drug to relieve her symptoms. *See J.A. 777–78.* At Dr. Barclay's recommendation, Gwendolyn was transferred on an expedited basis to VCCW on January 24, 1985. Assistant VCCW warden Shirley Burton was notified of the reason for Gwendolyn's expedited transfer. Additionally, pursuant to the sentencing judge's order, Gwendolyn's medical records, which clearly documented her medical condition and a family history of heart disease, were sent with her to VCCW to become part of her institutional records.

Because of Gwendolyn's medical condition, VCCW officials immediately assigned Gwendolyn to VCCW's Clinic Hall medical unit. *See J.A. at 80, 795.* Clinic Hall is a twelve to fourteen bed unit where nurses provide round-the-clock care and monitoring of inmate-patients' medical conditions. Defendant Mary Spencer, R.N., was VCCW's head nurse, and defendant Rena Barker, C.H.N.T., was a Clinic Hall physician's assistant. Defendant Dr. Leon Dixon, a VCCW part-time contract physician, provided Gwendolyn's primary treatment at VCCW, and consulted with Gwendolyn concerning her medical problems on at least thirteen occasions between January 31, 1985, and February 26, 1986. On April 25, 1985, Dr. Dixon recommended that defendant Dr. Robert W. Fry refer Gwendolyn to the Medical College of Virginia cardiology unit ("MCV"). Dr. Fry, the Chief

Physician of the Office of Health Services for the Virginia Department of Corrections, initially approved Dr. Dixon's request for Gwendolyn's transfer to MCV, and contacted Dr. Michael A. Pears at MCV on June 4, 1985, to schedule an appointment. Ultimately, no appointment was scheduled and Gwendolyn was never referred to MCV physicians.

Following the aborted MCV referral, Gwendolyn continued to complain of chest pain. Additionally, Gwendolyn's mother continued to write VCCW and other state officials concerning her daughter's medical condition and perceived lack of medical care. Because of the continued complaints, Dr. Fry asked defendant Dr. Beorn, a contract internist for the Virginia Department of Corrections (VDOC), to evaluate Gwendolyn's condition. Dr. Beorn first saw Gwendolyn on August 2, 1985, and considered arteriosclerotic heart disease indicating parenthetically that he doubted this was the proper diagnosis. *See* J.A. at 677. Dr. Beorn admits that none of the performed tests could have indicated such a diagnosis because none of the tests were of any value in detecting cardiac problems. *See* Appellee's Br. at 6 (citing J.A. 677). Gwendolyn last saw Dr. Beorn on October 25, 1985, complaining of chest pain, shortness of breath, and dizziness. *See* J.A. at 668. Notwithstanding this visit, Beorn moved Gwendolyn out of VCCW Clinic Hall and into the general prison population. At no time did any of Gwendolyn's health care providers perform the necessary diagnostic testing to rule out arteriosclerotic coronary heart disease.

Between February 26, 1986, and June 11, 1986, the medical staff at VCCW apparently did not see or evaluate Gwendolyn. On June 11, 1986, Gwendolyn reported to the VCCW clinic complaining of chest pain, dizziness, weakness, and headaches, and was told to return to her dormitory. *See* J.A. at 670. Gwendolyn returned to the clinic on June 15, 1986, with similar complaints. The nurse on duty ordered Gwendolyn back to the dormitory with instruction to rest and relax. On June 16, 1986, at 8:55 AM, Gwendolyn, this time assisted by two inmates, returned to the clinic complaining of severe chest pain and pain in her arms. The clinic nurses checked Gwendolyn's vital signs and phoned Dr. Beorn at 10:00 AM to advise him of Gwendolyn's complaints and condition. Dr. Beorn prescribed a tranquilizer and ordered Gwendolyn to be placed under observation until Dr. Dixon arrived that evening. At 4:00 PM, Gwendolyn, having suffered an acute heart attack due to coronary artery thrombosis and arteriosclerosis, was found lying dead on the floor next to her bed in the clinic.

## II

In reviewing the district court's grant of defendants' motions for summary judgment, it is logical to consider separately the § 1983 liability of the defendant health care providers and the liability of the defendant prison administrators. We also note at the outset that Dr. Dixon, though a private contract physician, does not contest that if his actions resulted in a deprivation of Gwendolyn's constitutional rights, he would be subject to liability under § 1983. *See Carswell v. Bay County*, 854 F.2d 454, 456 (11th Cir.1988).

## A

 Deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. § 1983 as constituting cruel and unusual punishment contravening the eighth amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986) (cases collected). Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir.1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable

person in the defendant's position. *See id.* Nevertheless, mere negligence or malpractice does not violate the eighth amendment. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

### 1

We turn first to Miltier's claims against Gwendolyn's treating physicians: Drs. Dixon, Fry, and Beorn. In granting the defendant physicians' respective motions for summary judgment, the district court held that, although the individual actors may indeed have been negligent, none of their acts rose to the level of deliberate indifference required to make out an eighth amendment violation under *Estelle.* The district court reasoned that, although interrogatories reflected that Miltier's medical expert, Dr. Simpson, was prepared to testify that each of the defendant physicians had breached the standard of care owed Gwendolyn Miltier, in no interrogatory or deposition was Dr. Simpson expressly asked, nor did he expressly state, that Gwendolyn's maltreatment constituted more than mere negligence. The district court, based upon the following dictum in *Rogers v. Evans,* 792 F.2d at 1058, held Dr. Simpson's omission fatal to Miltier's claim: "Whether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses." *Id.* Dr. Simpson's failure expressly to testify that the defendant physicians' conduct was "grossly negligent" obviated Miltier's claim.*

■ We simply cannot agree that *Rogers* requires expert incantation of "gross indifference" or "deliberate indifference" before a § 1983 claim against a physician can survive summary judgment. We read *Rogers* merely to stand for the logical proposition that expert exploration is required to aid the jury in determining the threshold standard of medical care. From there, it would require no great leap of logic for a jury to find, even without further expert testimony, that certain actions fell so far below the enunciated standard of care that they constituted gross indifference actionable under § 1983. *Rogers* nowhere requires express expert testimony to the effect that the physicians' behavior was grossly negligent as the *sine qua non* of a § 1983 deliberate indifference claim.

■ In determining whether to grant summary judgment, all justifiable inferences must be drawn in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Where it is an "eminently reasonable, if not inescapable, inference" that an expert would testify a certain way, denial of summary judgment is "entirely in keeping with the Supreme Court's admonition that 'all justifiable inferences are to be drawn in ... favor [of the non-movant].'" *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33, 38 n. 11 (D.C.Cir. 1987) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513). Taking the evidence of Gwendolyn's maltreatment in the light most favorable to Miltier, it is certainly an eminently reasonable, if not inescapable inference that Dr. Simpson would testify that, in treating Gwendolyn, her physicians' actions "disregard[ed] a substantial risk of danger that either [was] known to [them] or would be apparent to a reasonable person in [their] position," *Benson v. Cady,* 761 F.2d at 339, such as to render them liable under § 1983. Moreover, once a plaintiff "has named a witness to support her claim, summary judgment should not be granted without ... somehow showing that the named witness' possible testimony raises no genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 328, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (White J., concurring). At no time did Dr. Simpson limit his testimony to the negligence of the treating physicians and it was error for the trial court to infer such a limitation. *See Ditkof v. Owens–Illinois,*

---

* Because we find that Simpson's deposition testimony coupled with the record evidence of the physicians' treatment creates a triable jury issue, we need not address the district court's refusal to grant Miltier's motion to incorporate an affidavit filed in response to the defendant's reply brief raising for the first time this interpretation of *Rogers.* The affidavit stated that, in Simpson's opinion, each of the physicians acted with gross negligence.

*Inc.*, 114 F.R.D. 104, 106 (E.D.Mich.1987) ("plaintiff has identified a witness; the parties simply dispute the probable content of his testimony. Such a dispute raises a genuine fact issue for trial. . . .").

■ Even aside from the Simpson affidavit, the record evidence taken in the light most favorable to Miltier would support an inference that each of the three treating physicians was deliberately indifferent to Gwendolyn's serious medical need. Dr. Dixon, who was apparently most familiar with Gwendolyn's condition, was obviously well aware that her symptoms were cardiac-related. This is evidenced by Dixon's recommendation, as early as 1985, that Gwendolyn be referred to the MCV cardiac unit. This was over a year before Gwendolyn died. The evidence suggests that Dixon made no effort to follow up on his recommendation even though he saw Gwendolyn for the same chest and arm pains on numerous occasions following his recommendation. Failure to provide the level of care that a treating physician himself believes is necessary could be found conduct which "surpass[es] negligence and constitute[s] deliberate indifference." *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 704 (11th Cir.1985) ("Intentional failure to provide service acknowledged to be necessary is the deliberate indifference proscribed by the Constitution.").

Similarly, the evidence of record would support a finding that Dr. Fry, after approving the recommendation for referral to MCV, did nothing to follow up. Moreover, as with Dr. Dixon, Dr. Fry was aware of Gwendolyn's continued complaints after referral to the MCV cardiology unit. Fry claims that Dr. Pears, an MCV physician, purportedly did not believe a cardiac evaluation was warranted based upon Dr. Fry's recitation of Gwendolyn's symptoms. Dr. Pears, although he could not recall the substance of the conversation with Fry, stated that, based upon Gwendolyn's symptoms, he certainly would have recommended an evaluation. Clearly, this presents a triable jury question on the issue of Fry's deliberate indifference to Gwendolyn's medical needs. *See Ancata,* 769 F.2d at 704.

Finally, even Beorn concedes that the tests he conducted did not allow him to rule out arteriosclerotic heart disease in Gwendolyn's case. *See* Appellee's Br. at 6. Even when all of Gwendolyn's test results returned normal, indicating that there was no non-cardiac explanation for her symptoms, Dr. Beorn continued to treat her symptoms as non-cardiac-related and failed to order a cardiac evaluation. When coupled with Dr. Simpson's testimony, it is clear that a reasonable jury could find deliberate indifference. *See id.*

Viewing the treating physicians' failure to act and Dr. Simpson's expert testimony in the light most favorable to Miltier, we conclude that the district court erroneously dismissed Miltier's claim on summary judgment.

### 2

■ We turn next to Miltier's claim against Nurses Spencer and Barker. Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference to those needs. *See Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir.1986). Adrena Taylor, Gwendolyn's co-inmate at VCCW's Clinic Hall, testified in deposition that on more than one occasion Gwendolyn lost consciousness, fell, and was left unattended by Nurses Barker and Spencer. *See* J.A. at 764–65. Additionally, Miltier offered the affidavits of VCCW inmates Carlotta Grandi and Wanda Benton. Benton's affidavit states that Nurse Spencer told Grandi that Gwendolyn was fabricating her complaints and that her problems were all in her mind. *See* J.A. at 771–72. Grandi's affidavit made similar averments concerning Nurse Spencer. *See* J.A. at 769–70.

Finally, Miltier offered a Fed.R.Civ.P. 26(b)(4) statement of expert witness testimony setting forth the expected testimony of Miltier's nursing expert, Robin Ledbetter, to the effect that the nurses' breach of care was "so egregious as to be deliberately indifferent to Gwendolyn's medical needs." J.A. at 741. Nevertheless, be-

cause Ledbetter failed to repeat this testimony in her deposition, the district court held that, under *Rogers*, Ledbetter's failure justified summary judgment in favor of nurses Spencer and Barker. As discussed above, this misinterprets *Rogers*. Taken as true for the purposes of reviewing the district court's grant of summary judgment, inmates Grandi, Taylor, and Benton's affidavits, coupled with Ms. Ledbetter's testimony, create a triable issue on the question of the defendant nurses' deliberate indifference. This evidence manifestly forecloses summary judgment for the nurses.

### III

We turn now to the liability of the defendant VCCW officials—Wardens Downes and Burton and defendant VDOC officials Murray and Kessler (hereinafter referred to as supervisory defendants).

■ Section 1983 liability on the part of the supervisory defendants requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care, *see Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir.1979); (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, *see Gamble v. Estelle*, 554 F.2d 653, 654 (5th Cir.1977); or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations. *See Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (discussing supervisory liability for an inmate's beating by prison guards). Miltier concedes that Gwendolyn had unfettered access to VCCW's medical system. Miltier's claim of supervisory liability appears to rest on the third theory.

■ Supervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury. *See Slakan*, 737 F.2d at 372. The plaintiff "not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must also show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Slakan*, 737 F.2d at 373 (quotation omitted). It is insufficient merely to show deliberate indifference to a serious medical need on the part of the subordinate physicians. *See Boyce*, 595 F.2d 948 (no supervisory liability despite potential deliberate indifference claim against subordinate physicians).

■ Miltier points to correctional expert Joseph P. Gallagher's testimony to the effect that the four supervisory defendants' actions went far afield of any accepted correctional standards. Taking his testimony as true, as we must for the purposes of ruling on the propriety of summary judgment for the supervisory defendants, this testimony alone is simply insufficient to create a triable issue. *Cf. Rogers*, 792 F.2d at 1058 (plaintiff's allegation that the prison failed to meet standard derived from model standards for good prison administration failed to rise to the level of an eighth amendment violation). Even assuming that the physicians' failure to provide a cardiac exam was a "pervasive and unreasonable risk of harm from some specified source," *see Slakan*, 737 F.2d at 372, it would be an unprecedented extension of the theory of supervisory liability to charge these wardens, not only with ensuring that Gwendolyn received prompt and unfettered medical care, but also with ensuring that their subordinates employed proper medical procedures—procedures learned during several years of medical school, internships, and residencies. No record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise. Moreover, everything in the record suggests that the wardens closely monitored Gwendolyn's health and ensured that she received medical treatment. *See Boyce*, 595 F.2d at 953. Although record evidence suggests that the wardens were aware of Gwendolyn's deterioration, it would be ironic indeed if their awareness, resulting from close monitoring of Gwendolyn's condition, became the vehicle by which they were

rendered liable under § 1983 for their subordinates' misconduct.

In *Boyce v. Alizaduh,* 595 F.2d at 953, we stated that where the plaintiff-inmate's complaint nowhere indicated that supervisory defendants neglected his needs, and where the prison physician promptly saw the plaintiff and engaged in a course of treatment, the supervisory defendants were "beyond any doubt not liable to the plaintiff under any conceivable state of facts." *Id.* Here, Miltier has failed to meet the heavy burden of proof in supervisory liability cases. *Slakan,* 737 F.2d at 373. Miltier's complaint is directed at the prison physicians who actually performed the treatment, while the wardens are parties, not for having failed to provide treatment, but on a theory of *respondeat superior.* In short, there is simply no evidence to support a finding that the wardens tacitly authorized their subordinate health care providers to employ grossly incompetent medical procedure. *Cf. Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1985) (failure of prison officials to respond to inmate's note alleging threat by fellow inmate did not constitute abusive or oppressive employment of governmental power such as to render supervisory personnel liable under the due process clause for inmate's beating).

As to VDOC officials Murray and Kessler, there is simply no evidence that they were made aware of any complaints after 1985—a year before Gwendolyn died. Their participation in Miltier's medical condition is even more remote than that of wardens Murray and Kessler and is too attenuated to suggest deliberate indifference on their part. *Cf. Rogers,* 792 F.2d at 1059 (defendant too remote from medical situation to fall under *Estelle* deliberate indifference standard).

## IV

■ Wardens Downes and Burton cross appeal the district court's denial, without explanation, of their motion for sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927. Downes and Burton request this court to vacate and remand this portion of the district court's opinion for further proceedings. Our review is for abuse of dis-

cretion. *See Foval v. First Nat'l Bank of Commerce in New Orleans,* 841 F.2d 126, 130 (5th Cir.1988).

■ Fed.R.Civ.P. 11 requires imposition of sanctions upon attorneys or their clients who file pleadings not reasonably grounded in fact or law. *See Lavay Corp. v. Dominion Fed. Sav. & Loan Ass'n,* 830 F.2d 522, 528 (4th Cir.1987). When the motion for sanctions is foolish, or when the reasons for denying a colorable motion are apparent from the record, the judge "need not belabor the obvious." *Szabo Food Serv., Inc. v. Canteen Corp.,* 823 F.2d 1073, 1084 (7th Cir.1987). Nevertheless, in cases where the circumstances and the record do not clearly reflect the reasons for the district court's disposition of a Rule 11 motion, we have remanded with instructions that the district court make findings of fact concerning the frivolousness of the nonmovant's action. *See, e.g., Straitwell v. National Steel Corp.,* 869 F.2d 248, 253 (4th Cir.1989).

Miltier's claim, as we understand it, was that Wardens Downes and Burton were indifferent to the prison physicians' grossly incompetent course of treatment. As noted above, it is undisputed that the wardens granted Miltier unfettered access to the prison's extant medical facilities. Their only error, if any, was in relying on their subordinates' competence—competence upon which they were entitled to rely under these circumstances. We therefore cannot say that the circumstances and the record clearly reflect the reasons for the district court's denial of Downes' and Burton's Rule 11 motion. Accordingly, we remand for consideration (or reconsideration) the motions of Downes and Burton for Rule 11 sanctions. In doing so we express no opinion on the merits of the motion. The reasons for the district court's action on the motion should be at least briefly set forth.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.