**Ricky Wayne BOBLETT, Plaintiff,**

v.

**Ron ANGELONE, et al., Defendants.**

Civil Action No. 96–0264–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Jan. 16, 1997.

Ricky Wayne Boblett, Dillwyn, VA, Pro Se.

Pamela Anne Sargent, Office of the Attorney General, Richmond, VA, for Defendants Angelone, Morris & Johnson.

Rosalie V. Pemberton, Timberlake, Smith, Thomas & Moses, P.C., Staunton, VA, for Defendant Smith.

### Memorandum Opinion

JACKSON L. KISER, Chief Judge.

Plaintiff Ricky Wayne Boblett has filed this *pro se* civil action pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28 U.S.C. § 1343. He also asserts rights under the Rehabilitation Act of 1973 ["Rehabilitation Act"], 29 U.S.C. § 794 and the Americans with Disabilities Act ["ADA"], 42 U.S.C. § 12132. In his complaint, plaintiff, who is an inmate within the Virginia Department of Corrections ["VDOC"], alleges that he has been denied constitutionally adequate treatment for degenerative condition affecting his knee, that he has been denied certain privileges as a result of this condition and that he has been involuntarily subjected to environmental tobacco smoke ["ETS"]. Plaintiff names Ron Angelone, Ed Morris, Gene Johnson, Dr. Vernon Smith, J.D. Terry, Thomas Neumayer, Nurse Heath, Daniel Mahon, Patrick Gurney and Larry Huffman as defendants. He seeks injunctive relief and monetary damages.

Defendant Smith, through counsel, filed a motion for summary judgment. The remaining defendants, save for Nurse Heath ["the administrative defendants"], filed a motion to dismiss, which I shall construe as motion for

summary judgment due to the inclusion of documentary support.[1]  *See* Fed.R.Civ.Pro. 12(b)(6).  The court notified the plaintiff of the defendants' motions as required by *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), and warned plaintiff that judgment might be granted for the defendants if plaintiff did not respond to the motions.  Plaintiff has responded.  Therefore, these motions are now ripe for disposition.[2]  Inasmuch as Nurse Heath has never properly been made a party to this action, I shall address the claims asserted against her, as well as certain other claims against the served defendants, under 42 U.S.C. § 1997e(c).

Upon motion for summary judgment, the court must view the facts and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985).  Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Under § 1997e(c), this court may dismiss any civil rights action brought with respect to prison conditions by a prisoner confined in any jail, prison, or other correctional facility "if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief."

Unless otherwise noted, the following facts are undisputed.  In August of 1992, while at Bland Correctional Center ["BCC"], plaintiff complained of pain in his knees and received a referral to Dr. Donnelly, an orthopedist.  Upon examining plaintiff, Dr. Donnelly prescribed "vigorous rehabilitation therapy" and knee braces.  In August of 1993, while at Keen Mountain Correctional Center ["KMCC"], plaintiff again complained of pain in his knees and received a referral to Dr. Freeman.  Dr. Freeman opined that plaintiff was suffering from an abnormal softening in both knees and a possible torn cartilage, and he concurred in the treatment prescribed by Dr. Donnelly.  Dr. Freeman also recommended that plaintiff avoid deep squat thrusts.

In October of 1994, upon plaintiff's arrival at Dillwyn Correctional Center ["DwCC"], plaintiff complained of persistent pain in his knees.  As a result of this complaint, Dr. Alvig, the staff physician, approved plaintiff for assignment to a bottom bunk.  In May, 1995, plaintiff again complained about pain in his knees, and he was examined by Dr. Alvig, who noted some fluid on the knee but a full range of motion.  Dr. Alvig prescribed an anti-inflammatory and a knee brace and recommended a reduction in athletic activity.  Plaintiff did not receive the knee brace.

On November 17, 1995, plaintiff was transferred to Botetourt Correctional Unit # 25 ["BCU"].  On the following day, plaintiff filed an emergency grievance in which he requested assignment to a bottom bunk to eliminate pain caused to his knees by climbing in and out of a top bunk.  Shortly thereafter, plaintiff consulted with a nurse, who recorded in plaintiff's medical records that plaintiff was having difficulty in doing squat-thrusts with weights exceeding 200 pounds.  On November 20, 1996, Nurse Heath examined plaintiff in connection with his request for a bottom bunk.  Nurse Heath recorded in plaintiff's medical records that plaintiff represented, during this examination, that he regularly did squat-thrusts in excess of 300 pounds.[3]  She then denied his request.

---

**1.**  The court has never accomplished service on Nurse Heath.

**2.**  I note, however, that, by order dated November 19, 1996, I granted motions for a protective order filed by defendant Smith and the administrative defendants.  Therefore, I will consider defendants' motions for summary judgment in view of the fact that plaintiff has not been allowed to engage in all the discovery that he has requested.

**3.**  Plaintiff indicates in his response to the correctional defendants' motion to dismiss that the entry itself was a fabrication.

Sometime during this same period of time, plaintiff requested an assignment to a non-smoking dormitory. Correctional Officer J.D: Terry apparently denied this request.

On November 20, 1995, plaintiff returned to DwCC from BCU. Plaintiff made no complaints about his knees at intake, nor did he make any complaints about his knees to the medical department at DwCC until some months later. Plaintiff did, however, file several written complaints with Warden Mahon in regard to the lack of facilities at DwCC for the rehabilitation of his knee. Each time, Warden Mahon informed plaintiff that he should contact the medical department. Assistant Warden Neumayer also advised plaintiff of a need to consult with the medical department if he wished further rehabilitative therapy. On February 14, 1996, plaintiff requested a consultation with a physician "about medical transfer to [BCC] or KMCC for mandated physical therapy on knees." On February 27, 1996, plaintiff wrote a letter to Dr. Vernon Smith in which he represented that he was in need of vigorous rehabilitative therapy.[4] On May 15, 1996, Dr. Smith examined plaintiff and indicated that plaintiff should be scheduled for an orthopedic consultation at Powhatan Correctional Center ["PCC"]. Due to some confusion about the purpose of the resulting appointment for May 22, 1996, plaintiff refused to go to this initial appointment.

On August 6, 1996, Dr. May, an orthopedic specialist at PCC, examined plaintiff's knees. Either upon the basis of this examination or some later examination, Dr. May recommended surgery and prescribed knee braces. Upon completion of surgery, plaintiff will require rehabilitative therapy, but there continues to be inadequate facilities for rehabilitative therapy at DwCC. Dr. Ofogh, the new staff physician at DwCC, has confirmed this need for rehabilitative therapy following surgery.

▮ Plaintiff first contends that the foregoing facts establish a violation his rights

under the Rehabilitation Act and the ADA. Defendants argue that the Rehabilitation Act and the ADA do not apply to state prisons. I concur in the defendants' position. In *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), the Court of Appeals for the Fourth Circuit strongly suggested that the Rehabilitation Act and the ADA do not apply to prisons. The Court stated that, absent a clear expression of congressional intent, the Rehabilitation Act and the ADA should not be applied to core state functions, such as the management of state prisons. The Court of Appeals noted that such an application of the statutes would "have serious implications for the management of state prisons, in matters ranging from cell construction and modification, to inmate assignment, to scheduling, to security procedures." *Torcasio*, 57 F.3d at 1346.

More recently, the United States District Court for the Eastern District of North Carolina and the United States District Court for the Eastern District of Virginia have held that the ADA does not apply to prisons. *Staples v. Virginia Department of Corrections*, 904 F.Supp. 487 (E.D.Va.1995) (ADA is inapplicable to state prisons); *Pierce v. King*, 918 F.Supp. 932 (E.D.N.C.1996) (ADA does not create cause of action for inmate dissatisfied with prison work assignment). Inasmuch as neither the ADA nor the Rehabilitation Act contains any clear expression of congressional intent that the statutes be applied to state prisons and inasmuch as the application of the ADA and the Rehabilitation Act to state prisons would greatly intrude upon the ability of state officials to manage their prisons, I conclude that the Rehabilitation Act and the ADA do not apply to state prisons. Accordingly, I shall grant the defendants' motion to dismiss as to this claim.

▮ Plaintiff next argues that the denial of proper rehabilitative therapy and knee braces while at DwCC violates his rights under the Eighth Amendment. In order to state a cognizable Eighth Amendment claim

---

4. I note that, according to the record before the court, defendant Smith became the supervising physician at DwCC during the early half of 1996 because Dr. Alvig, the staff physician, retired in January, 1996. It is undisputed that Dr. Smith did not become a full-time staff physician at DwCC and that he was unable to consult with inmates on as frequent a basis as such a staff physician.

for denial of medical care, a plaintiff must allege acts sufficient to evince a deliberate indifference to a serious medical condition. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish deliberate indifference, a plaintiff must present facts tending to demonstrate actual knowledge or awareness of the serious medical need on the part of the named defendants. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Mere malpractice on the part of medical personnel is insufficient to state a claim under the Eighth Amendment, *Id.* at 106, 97 S.Ct. at 292, and questions of medical judgment generally are not subject to judicial review. *Russell v. Sheffer,* 528 F.2d 318 (4th Cir.1975). Moreover, mere disagreements between the inmate and the medical staff as to what is the proper course of treatment do not state a claim upon which relief can be granted. *Id.* Correctional officials are entitled to rely on the expertise of their institution's medical staff and can only be held liable for inadequate medical treatment if they interfered with the medical staff's treatment or were aware that the staff was providing grossly inadequate care and tacitly authorized the provision of such care. *Miltier v. Beorn,* 896 F.2d 848, 854–55 (4th Cir.1990).

■ In the present case, plaintiff's complaints regarding a denial of rehabilitative therapy and knee braces at DwCC may temporally be divided into two categories. First, the record before the court reveals that, from October, 1995, until February 14, 1996, plaintiff made only a single complaint to the medical department at DwCC in regard to pain in his knees. At that time, Dr. Alvig prescribed an anti-inflammatory and recommended a knee brace. Although plaintiff apparently did not receive the knee brace, he also made no further complaints to the medical department until February 14, 1996, when he requested approval for a medical transfer to BCC or KMCC for rehabilitation. Beginning

in December, however, he began to complain to administrators at DwCC, and elsewhere in the VDOC, that he should be housed at a correctional center capable of accommodating his need for rehabilitative therapy upon the ground that Dr. Donnelly, in 1992, and Dr. Freeman, in 1994, recommended such therapy for his knees. Warden Mahon and Assistant Warden Neumayer both advised plaintiff that he needed to contact the medical department to initiate the process for a medical transfer. All other of the administrators to whom plaintiff addressed his complaints referred the matter back to Warden Mahon.

■ There is absolutely nothing unconstitutional in the delegation of a decision as to whether an inmate warrants a transfer for medical reasons to medical staff. *See Miltier, supra.* Although there may have been prescriptions for rehabilitative therapy contained in plaintiff's records, one was over a year old and the other was three years old. In my view, the decision as to whether rehabilitative therapy was still necessary after this length of time is just as much a medical judgment as the decision to prescribe therapy in the first place and is thus likewise delegable. I also find that the failure to provide a knee brace upon a single recommendation by a physician, in the absence of any subsequent requests whatsoever by plaintiff, does not demonstrate deliberate indifference. *See Estelle, supra.* I conclude, therefore, that plaintiff has failed to establish a claim of constitutional dimensions in regard to the medical care received by him at DwCC from October, 1994, until February 14, 1996.

■ The second temporal period of which plaintiff complains begins on February 14, 1996, and extends to the present time.[5] In response to plaintiff's request to see a physician for approval of a medical transfer on February 14, 1996, a nurse placed plaintiff's name on a waiting list to see a physician. Although Dr. Smith did not examine plaintiff until May 15, 1996, there is nothing in the

---

5. I note that plaintiff has never properly amended his complaint to include any claims arising after March 20, 1996, the date on which he filed his amended complaint. As a result, the administrative defendants have never responded to the allegations involving events after this date. Nevertheless, I shall construe plaintiff's submissions involving allegations after March 20, 1996, as motions to amend, grant these motions to amend and address all amended claims to which the administrative defendants have not responded under 42 U.S.C. § 1997e(c). Defendant Smith has responded to all allegations against him.

record to suggest that this delay stemmed from any deliberate indifference on the part of Dr. Smith or any other defendant. Plaintiff does not deny that he went months at a time without complaining of pain in his knees. Indeed, plaintiff made only a single complaint of pain from October, 1994 until November 18, 1995, when he was at BCU. Yet, while he refers to "crippling" and "unbelievable" pain in his letters to Warden Mahon and Dr. Smith during this time period, he does not indicate that he informed the medical staff of any mishap resulting in increased pain or even any sudden increase in pain. Under these circumstances, I am of the opinion that any failure by Dr. Smith, or other medical personnel, to make accommodations for a more immediate consultation with a physician does not amount to deliberate indifference. *See Estelle, supra.*

█ Upon examining plaintiff on May 15, 1996, Dr. Smith immediately referred plaintiff to a specialist at PCC. Although plaintiff did not receive a consultation with this specialist until August 6, 1996, it is undisputed that the delay in this consultation stemmed from plaintiff's misguided refusal to be transported to the appointment on May 22, 1996. The record reveals that plaintiff's refusal resulted in a cancellation of plaintiff's appointment with the specialist at PCC until July 17, 1996, when Dr. Smith received word that plaintiff had misunderstood the reason for his transportation to PCC. Plaintiff does not contradict defendant Smith's sworn representation that, soon thereafter, the appointment was rescheduled for August 6, 1996. Clearly, a delay precipitated by plaintiff's own actions does not amount to deliberate indifference on the part of the defendant Smith or any other member of the medical staff at DwCC. *See Estelle, supra.*

█ On August 6, 1996, Dr. May, the specialist at PCC, examined plaintiff, and, as a result of this or some subsequent examination, Dr. May recommended surgery and prescribed knee braces. Plaintiff's pleadings are inconsistent as to whether Dr. May also prescribed immediate rehabilitative therapy. In a pleading submitted August 13, 1996, plaintiff intimates that the prescription was for therapy prior to surgery. However, in all subsequent pleadings, he suggests that physicians have prescribed rehabilitative therapy for the period following surgery. In any event, plaintiff appears to concede that he has been scheduled for surgery, and he does not allege that he was denied the knee braces ordered by Dr. Mays.[6] Even assuming that Dr. May or Dr. Ofogh, the staff physician at DwCC, did prescribe immediate rehabilitative therapy, therefore, I am of the opinion that the plaintiff has nonetheless failed to state a claim of constitutional dimensions against the named defendants for failure to transfer him to an institution where he could receive this therapy. *See Estelle, supra.* Although, under some circumstances, an inmate might conceivably have a need for therapy to alleviate severe pain for the time period preceding surgery, plaintiff has not established any deliberate indifference to this need by the parties to this action. Clearly, it is not incumbent upon administrators to comb through an inmate's medical records to determine whether a physician has hinted at a need for a particular form of treatment. Yet, while plaintiff refers to severe pain in his pleadings, he does not ever indicate that Dr. Ofogh or Dr. Mays has done anything more than "recommend" rehabilitative therapy of some sort. In other words, plaintiff does not suggest that any physician has ever gone so far as to approve him for a medical transfer or even recommend a transfer directly to an

6. Plaintiff has never updated his allegation, contained in his motion for a preliminary injunction, that Dr. Mays ordered the provision of knee braces. I also note that the record does not disclose the status of plaintiff's surgery. In plaintiff's "supplemental opposition to summary judgment motion," plaintiff states that "the defendant[ ]s have intentionally left him with unnecessary pain and suffering and have let this problem go so far as to degenerate to the point of needing surgery which they not [sic] won't do or

have chosen to ignore." It is not at all clear to me what this sentence asserts in regard to the status of plaintiff's surgery. However, given the fact that plaintiff's arguments throughout the remainder of this "supplemental opposition" are based solely on his constitutional right to rehabilitative therapy, I am unwilling to construe this allegation to state that administrators have refused to provide plaintiff with the surgery ordered by Dr. Mays.

administrator.[7] Under circumstances in which an inmate has been scheduled for surgery, I do not believe that it is deliberate indifference to expect an explicit recommendation from a physician before effecting a transfer for the purpose of providing *immediate* care. *See id.* Moreover, I find that plaintiff's mere speculation as to what will occur after his surgery is insufficient to state a claim of constitutional dimensions.

For the foregoing reasons, I am of the opinion that plaintiff has failed to establish that his constitutional rights were violated by any alleged denial of medical care at DwCC. Insofar as the administrative defendants' motion for summary judgment is responsive to plaintiff's allegations involving the denial of medical care at DwCC, I shall grant this motion. Insofar as plaintiff has raised additional allegations since the administrative defendants' motion, I shall dismiss these allegations for failure to state a claim pursuant to 42 U.S.C. § 1997e(c).[8] Finally, I shall grant defendant Smith's motion for summary judgment as to these allegations.

■■■■■ Plaintiff next appears to argue that the refusal by Nurse Heath or Correctional Officer J.D. Terry to assign him to a nonsmoking dormitory while he was at BCU amounts to a violation of his rights under the Eighth Amendment. It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In *Helling,* the Supreme Court held that in order to prove a cause of action for exposure to environmental tobacco smoke ["ETS"] in violation of a prisoner's Eighth Amendment rights, the prisoner must prove that the defendants have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health. *Id.* In the instant case, plaintiff clearly has not established that the level of ETS to which he was exposed at BCU for a four-day period has created an unreasonable risk of serious damage to his future health. Accordingly, I shall grant the administrative defendants' motion for summary judgment as to this claim, and, pursuant to § 1997e(c), I shall dismiss these allegations for failure to state a claim insofar as they implicate Nurse Heath.

■■■ Finally, plaintiff appears to contend that, in light of the pain caused him by having to climb in and out of a top bunk, Nurse Heath and J.D. Terry violated his constitutional rights when they refused to assign him to a bottom bunk. I disagree. I am of the opinion that discomfort precipitated by getting in and out of bed for a four-day period does not amount to either a serious injury under *Strickler v. Waters,* 989 F.2d 1375, 1380–1381 (4th Cir.1993), which requires such a showing for a claim of inadequate living conditions, or a serious medical need under *Estelle, supra.* Moreover, plaintiff has again failed to establish that the actions of the defendants have placed his future health at risk. *See Helling, supra.* Accordingly, I shall also grant the defendants' motion for summary judgment as to this claim, and, pursuant to § 1997e(c), I shall dismiss this claim insofar as it is asserted against Nurse Heath.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of the Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5) or 4(a)(6).

The clerk of the Court is directed to send certified copies of this Memorandum Opinion

---

**7.** I note that, of the named defendants, only Dr. Smith appears to be a physician. However, for the period of time between plaintiff's appointment with Dr. Mays and the present time, Dr. Smith has apparently functioned only as an administrator.

**8.** I note that, for simplicity's sake, I have, at times, addressed all of plaintiff's claims as if in the context of a motion for summary judgment filed by the defendants. To the extent that the administrative defendants have not responded to allegations involving conduct from March 20, 1996 until August 6, 1996, I find that plaintiff's allegations themselves, even when considered apart from the additional evidence provided by defendant Smith, establish that the administrative defendants merely relied on the expertise of medical personnel. *See Miltier, supra.*

and accompanying Order to plaintiff and to counsel of record for the defendants.