**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CASSANDRA WALKER,
Plaintiff-Appellant,

v.

No. 98-2219

MCI TELECOMMUNICATIONS
CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-97-1727-A)

Argued: March 4, 1999

Decided: July 16, 1999

Before WILKINSON, Chief Judge,
BROADWATER, United States District Judge
for the Northern District of West Virginia, sitting by designation,
and MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Michael Patrick Deeds, KESTELL & ASSOCIATES,
Washington, D.C., for Appellant. Jonathon Lance Nevett, MCI

TELECOMMUNICATIONS CORPORATION, Washington, D.C., for Appellee. **ON BRIEF:** James L. Kestell, KESTELL & ASSO-CIATES, Washington, D.C., for Appellant. Thomas F. O'Neil, III, Harvey D. Rumeld, David R. Shopfner, MCI WORDCOM, INC., Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Cassandra Walker appeals from the district court's grant of summary judgment in favor of MCI Telecommunications Corporations in her employment discrimination action alleging racial and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) (1994), and under 42 U.S.C. § 1981. We have reviewed the briefs and record in this case, and we have heard oral argument. We conclude that the district court's decision was correct, and finding no reversible error, we affirm.

I.

Cassandra Walker ("Walker") is an African-American female who began her career with MCI Telecommunications Corporation ("MCI") in 1991 as a temporary employee working as a group secretary. In 1992, MCI hired Walker as a permanent employee as Systems Tech/Help Desk Support on the Consumer Help desk and Problem Solutions group ("Help Desk") under the supervision of Jonathan Naugle ("Naugle"). In this capacity, Walker answered phone calls from employees and contractors who were experiencing problems with their personal computers and assigned trouble tickets to system technicians. Walker also accompanied technicians in the field. According to Naugle, Walker initially performed effectively and professionally with co-workers and customers. Walker's performance

2

first became an issue following two staffing changes on the Help Desk team. The first change occurred in late 1995, when MCI selected Joel Williams ("Williams"), a Caucasian male, to be the first-line manager over the Help Desk. Williams' duties included scheduling of shifts and evaluating the performance of the Help Desk staff. The second change occurred shortly thereafter, when MCI hired Stephanie Yates, ("Yates"), an African-American female, as a full-time employee at the Help Desk.

Following these two changes, Naugle observed a personality conflict between Walker and Williams[1] that was adversely affecting the atmosphere and team work on the Help Desk group. Naugle received complaints from Walker about Williams,[2] from Williams about Walker,[3] and from various people on the team about the interaction between Walker and Williams. Naugle also became aware of a series of incidents involving Williams and other employees,[4] Walker and other employees,[5] including incidents between Walker and Yates.[6]

---

[1] According to Naugle, "there were problems that were going on between Joel Williams and Cassandra Walker. . . .[Sort] of a personality conflict, in that the mannerisms that Joel Williams had in general were not taken well by Cassandra." (J. A. at 158).

[2] Walker complained that Williams would "schedule [her] in such a way that [she] was not able to get effective[Local Area Network] experience, which affected [her] ability to progress in [her] current job as well as [her] promotion potential. (J. A. at 270,¶ 5).

[3] Williams complained to Naugle that Walker "didn't take his role as team lead[er] as seriously as he would have liked," (J. A. at 310), "resented [his] authority as team leader[er]" (J. A. at 200), and "resist[ed] and challenge[d] [his] authority. (J. A. at 202). Williams also complained to Naugle "about [Williams and Walker] interaction and the problems they were having in getting some things done." (J. A. at 310).

[4] At his deposition, Naugle recalled that at least five other employees complained about Williams' "abruptness and brusqueness" (J. A. at 310, 312, 387-88).

[5] At his deposition, Naugle stated that he received reports from other employees on the Help Desk as well as a number of LAN technicians that Walker "gave the appearance that she was separate and distinct from the rest of the group." (J. A. at 389). Naugle also observed that Walker's "body language suggested [she] was turning away from the rest of the people . . . ." (J. A. at 389).

[6] At his deposition, Naugle recalled at least two incidents between

3

Naugle met with Walker and Williams to discuss their personality conflicts and to find a possible solution. Walker and Williams reassured Naugle that they would try to resolve their differences. Although the situation briefly improved, the problems worsened in the spring of 1996. Naugle received reports that Walker was creating friction in the group and that Walker was isolating herself from the rest of the group. Naugle also observed Walker's lack of interaction with co-workers. In response, Naugle met briefly with Ed DiMaio ("DiMaio"), Naugle's senior manager, and notified him about the problems his team was experiencing. DiMaio met with Walker and Williams but was unable to identify who was the source of the problems. However, DiMaio made clear to Walker and Williams that if they did not improve their working relationship, they would be subject to further disciplinary action, including termination.

To solve the tension problems among the Help Desk group, Naugle and DiMaio asked Virginia Ward ("Ward") to conduct a full-scale investigation. Ward, a human resources manager responsible for advising management on personnel issues, interviewed several members of the Help Desk group, including Walker and Williams separately. In mid-July 1996, Ward reported her findings to Naugle, concluding, among other findings[7] that Walker was the primary cause

_____

Yates and Walker, including a "bumping" incident which created "an atmosphere of being uncomfortable and not feeling like she could work effectively, because [Yates] thought she was being provoked by Cassandra [Walker]." (J. A. at 391). At her deposition, Walker recalled an incident with Yates in December of 1995, in which Walker and Yates were "shouting a each other." (J. A. at 98). Naugle also recalled observing Yates crying because of "smaller kinds of provoking things" and because "she thought she was being provoked by Cassandra[Walker]." (J. A. at 391).

[7] Ward reported the following findings to Naugle: 1) Walker resented Williams' team leader authority and frequently bypassed him by taking operational issues to Naugle; 2) Walker overreacted to situations that occurred among help desk employees; 3) Walker and Yates, both of whom are African-American, had a strained relationship as co-workers; 4) Williams was an effective team leader who applied Help Desk procedures evenly and consistently, albeit sometimes gruffly; 5) while both

4

of the friction between Williams and Walker and the primary cause of the tension among Help Desk employees generally. Ward also reported to Naugle that, even though both Walker and Williams were at fault, Walker's behavior appeared to be designed to aggravate Williams. Following her investigations, Ward counseled Walker and Williams and warned them that any incident of conflict or strife could result in further disciplinary action, up to and including discharge. Naugle also conducted follow-up meetings with Williams and Walker. Naugle informed Walker that she overreacted, was unreceptive to criticism, and that Ward found her to be a troublemaker. Naugle informed Williams of Ward's recommendations and as a consequence removed Williams as team leader.

Following Ward's investigation, the atmosphere of the Desk Help group improved for a short time, but in September 1996, Walker's behavior started to deteriorate again. Naugle observed and received reports from employees that the problems between Walker and co-workers continued. Specifically, Naugle learned that Walker was mimicking co-workers, distancing herself from her colleagues, and creating a tense atmosphere on the Help Desk group. Naugle discussed with Ward what disciplinary options were available. Even though discharge was one of the options discussed at that time, Naugle opted for a written warning as a final chance for Walker to improve her behavior. On October 7, 1996, Naugle called Walker into his office and presented Walker a formal disciplinary reprimand.**8**

_____

Williams and Walker shared responsibility for their interactions in the workplace, Walker was the primary cause of the friction between them; and 6) Naugle contributed to the environmental problems within CHAPS [Consumer Help Desk and Problem Solutions] by not intervening to correct the problems with Walker's behavior and by not establishing clear procedures regarding such issues as scheduling and Williams' team role. (J. A. at 213-14).

**8** The reprimand conveyed the following information: "Your behavior was cited as contributing to low morale and tension within the group. Specifically, you have yelled at and argued with your co-workers, raised your voice with callers while manning the help desk, demonstrated a reluctance to listen to feedback or take direction from your lead[er] and co-workers, and isolated yourself by not talking with your co-workers.

Walker refused to sign the reprimand. On November 8, 1996, following corroboration of two incidents involving Walker and Yates, Naugle terminated Walker's employment after conferring with his manager, Rob Banwarth, and a representative of Human resources. After Walker's termination, MCI reorganized the Help Desk group, moving it to Atlanta, Georgia. This move eliminated Walker's position. Walker then filed a charge of race and gender discrimination with the Equal Employment Opportunity Commission ("EEOC"). After the EEOC issued a Right to Sue Notice, Walker commenced the present action.

II.

We review the district court's grant of summary judgment de novo, Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994), applying the same legal standards as the court below. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954 (4th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)). For purposes of summary judgment, a fact is material if, when applied to the substantive law, it affects the outcome of litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In determining whether a genuine issue of material fact is in dispute,"[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. See also Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). To defeat MCI's motion for summary judgment, Walker must demonstrate the existence of a genuine issue of material fact. Thus, this Court must affirm the grant of summary judgment if it determines, after reviewing the record in the light most favorable to Walker, that MCI is entitled to judgment as a matter of law.

_____

Every person spoken to expressed concern about your behavior contributing to tension between you and one co-worker in particular. . . . [I]f you do note [sic] demonstrate professional behavior at all times, you will be subject to further disciplinary action, up to and including termination." J. A. at 410.

6

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp</u>., 475 U.S. 574 (1986).

The standards for awarding summary judgment apply equally in discrimination cases, even where the motive of intent of the defendant is at issue. <u>Henson v. Ligget Group</u>, Inc., 61 F.3d 270 (4th Cir. 1995) (upholding summary judgment where plaintiff failed to create a genuine issue of material fact as to whether employer intentionally discriminated against plaintiff); <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231 (4th Cir 1991) (affirming summary judgment where plaintiff was unable to rebut defendant's legitimate non-discriminatory reason for its action). However, the Fourth Circuit has noted that in evaluating a motion for summary judgment in employment discrimination cases, courts should be careful to grant such a remedy:

> "[S]ummary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense", courts must take special care in cases such as the instant one because motive often is the critical issue in employment discrimination cases.

<u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1004 (4th Cir. 1987) (internal citation omitted) (quoting <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

III.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discharge any individual, . . . because of such individual's race, . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). In order to demonstrate a case for disparate treatment, Walker must show either direct evidence of intentional discrimination or she must satisfy the familiar burden-shifting three-step circumstantial evidence test as articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny, <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981). <u>See also Gillins v. Berkeley Elec. Coop., Inc.</u>, 148 F.3d 413 (4th Cir. 1998), and <u>Evans v. Tech. Applications and Serv. Co.</u>, 80 F.3d 954 (4th Cir. 1996). Here, because Walker concedes that she has no direct evidence of discrimination,

7

she must show circumstantial evidence of discrimination by establishing a prima facie case of discrimination under McDonnell Douglas and its progeny.

To establish a prima facie case of race and sex discrimination in the context of a discharge case, Walker must show that: (1) she is a member of a protected class; (2) she was discharged; (3) at the time of her discharge she was performing at a satisfactory level and meeting her employer's legitimate expectations; and (4) her position remained open to similarly qualified applicants after her dismissal. Karpel v. Inova Health System Serv., 134 F.3d 1222 (4th Cir. 1998). Once Walker establishes a prima facie case of discrimination, the burden of production shifts to MCI to articulate a legitimate, nondiscriminatory reason for Walker's discharge. Burdine , 450 U.S. at 253. MCI is not required to prove absence of discriminatory motive, but merely articulate some legitimate reason for its action. Evans, 80 F.3d at 959. Once MCI proffers a legitimate nondiscriminatory reason for taking the adverse action, the burden shifts back to Walker to demonstrate that MCI's proffered reason for discharging her was merely pretextual and that it was discriminatory because of her race and gender. To meet this final burden, Walker must meet the pretext-plus standard established in Gillins v. Berkeley Elec. Coop., Inc., 148 F.3d 413 (4th Cir. 1998). Under Gillins, Walker must show both that the reason proffered by MCI "was false, and that discrimination was the real reason" for her discharge. Gillins, 148 F.3d at 417 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Hence, the ultimate burden of proving discrimination based on race or gender remains with Walker.

When granting summary judgment for the defendant, the lower court reasoned that even if Walker had marginally established a prima facie case of discrimination, she failed to rebut MCI's proffered reasons for discharging her as discriminatory. The district court concluded that if Yates had been a Caucasian female, the court would not have granted summary judgment for MCI because that would pose a real question of racial animus.

Walker challenges the district court's conclusion that she failed to rebut MCI's proffered reasons as pretextual and that the fact that Yates was an African-American female is irrelevant to the merits of

8

the case. Walker contends that summary judgment was inappropriate because of contradictions in the testimony concerning the "bumping" incident, the lenient treatment of Williams who engaged in similar misconduct, and issues of fact concerning the credibility of Naugle's proffered rationale for his decision.

As to Walker's first contention of contradictions in testimony, she argues that inconsistencies in the accounts of witnesses demonstrate that the "bumping" incident between Yates and Walker was a pretext for discrimination. Even if accounts of the incident show inconsistencies, it is undisputable that the "bumping" incident was serious. Yates reported the "bumping" incident to Naugle. Yates also told Naugle that she would leave the group if he did not intercede. Therefore, how the "bumping" accident occurred has nothing to do with Walker's contention of a racial animus surrounding her discharge.

As to Walker's second contention that Williams was treated more leniently, she argues that MCI's proffered reasons to discharge her are a pretext for disparate discipline. Walker alleges MCI did not treat her and Williams equally in terms of how MCI disciplined them, given the level of disruption caused by both of them in the workplace. While Naugle disciplined Williams by removing him as team leader for the Help Desk, Naugle discharged Walker. We disagree with Walker. Williams was counseled and disciplined at the same time as Walker. However, the problems with Walker continued, while there is no evidence in the record that there were any further problems with Williams. While Williams' personality may have provoked isolated complaints about his style and demeanor, he was regarded as an effective team leader. Walker, by contrast, was perceived as a flash point among the Help Desk co workers and largely responsible for creating an "eggshell" work environment among co-workers. Thus, while Walker, like Williams, initially received warnings and progressive discipline, her persistent acts of disruptive behavior prompted her discharge.

As to Walker's third contention concerning Naugle's credibility, there is no evidence in the record that racial animus permeated MCI's workplace or that Walker's discharge was triggered by racial reasons. Walker argues that the district court's rationale for granting summary judgment -- that Yates was also African-American-- is untenable.

9

Walker relies on O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996), to argue that an employer does not escape an inference of discrimination by showing that it took adverse action against the plaintiff in favor of a member of plaintiff's protected class. Walker's reliance on O'Connor is misplaced. Even if we do not agree with the district court's reasoning, Walker failed to advance any evidence that it was MCI's racial animus and not her disruptive behavior in the workplace that prompted her discharge. During his deposition, Naugle stated that Walker never told him that Williams was treating her differently because of her race. At her deposition, Walker also admitted that she did not tell anyone at MCI that she was being discriminated against.

> Question. During the time that you were employed at MCI, did you ever complain to anyone that Mr. Williams had discriminated against you on the basis of your race?
>
> Walker. I didn't complain in that manner the way you just said it . . . .

(J. A. at 75).

We conclude that Walker failed to offer any evidence to rebut MCI's legitimate nondiscriminatory justification for its discharge decision which followed MCI's unsuccessful attempts to counsel and warn Walker of the consequences of her disruptive behavior. Walker also failed to produce factual evidence to support an inference that her race or sex was a motivating factor in the discharge decision. MCI met its burden of production by showing that Walker's discharge was triggered by escalating disciplinary problems that created an intolerable environment of tension and low morale among the Help Desk.

For the reasons stated above, we conclude that the district court correctly granted MCI's motion for summary judgment as to Walker's claim of race and gender discrimination.

AFFIRMED

10