James G. LAWRENCE, Plaintiff,

v.

VIRGINIA DEPARTMENT OF CORRECTIONS,[1] P.A. Terrangi, Dr. Iberra,[2] Dr. Vernon Smith,[3] Charlyne Broughman–Critzer, Cathy Couther, Laurel Corners, Dr. Lalani McCann, James Keeling, Dr. Hasan Ozinal, Sally Casebolt, Dr. M.G. Haque, Frederick J. Schilling, III, and Ms. Dodson, Defendants.

No. 2:02CV869.

United States District Court, E.D. Virginia, Norfolk Division.

March 12, 2004.

1. By written Order dated July 1, 2003, the court dismissed the claims against the Virginia Department of Corrections on the basis of Eleventh Amendment immunity.

2. In his second amendment to the complaint, plaintiff incorrectly spelled this defendant's surname, which is Ibarra.

3. By written Order dated October 28, 2003, the court dismissed the claims against Dr. Vernon Smith on the basis that Smith is deceased and plaintiff has failed to provide the court with the name of the representative of Smith's estate.

James G. Lawrence, Jarratt, VA, Pro se.

Susan F. Barr, Office of Attorney General of Virginia, Richmond, VA, for Defendants P.A. Terrangi, Broughman–Critzer, Corners, Keeling, Schilling.

Jeff W. Rosen, Esquire, Lisa Ehrich, Esquire, Pender & Coward, PC, Virginia Beach, VA, for Defendants Iberra, Couther, McCann, Ozinal, Casebolt, Dodson.

John D. McChesney, Esquire, Ashton M. Jennette, Esquire, Rawls & McNelis, PC, Richmond, VA, for Dr. M.G. Haque.

## MEMORANDUM OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

Plaintiff, a Virginia inmate, brings this *pro se* action pursuant to 42 U.S.C. § 1983, to redress alleged violations of his constitutional rights by state officials. Specifically, plaintiff alleges that his Eighth Amendment right against cruel and unusual punishment was violated by defendant Broughman–Critzer, a prison guard who allegedly placed shackles that were too tight around plaintiff's ankles; and by defendants Ibarra, Ozinal, Smith, Couther, McCann, Casebolt, Schilling, Haque, and Dodson, prison medical staff officials who allegedly acted with deliberate indifference to plaintiff's medical needs. In addition, plaintiff alleges that defendants Terrangi, Corners, and Keeling, other prison officials, denied plaintiff's Fourteenth Amendment due process rights by inadequately responding to his prison grievances. This matter is before the court on all defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, plaintiff's claims against defendants Broughman–Critzer and Schilling are **DISMISSED** without prejudice. All other defendants' motions for summary judgment are **GRANTED**.

### I. Factual and Procedural History

On March 13, 1999, plaintiff arrived at Indian Creek Correctional Center ("ICCC"), a facility operated by the Virginia Department of Corrections ("VDOC"). Upon intake, defendant Dr. Jorge Ibarra, the institutional physician at the time, diagnosed plaintiff with "early bilateral in-

guinal hernia," but, finding that plaintiff was in "good general physical condition," approved him to perform any type of work. (Br. in Support of Pl. Opp. to Sept. 23, 2003 Mot. for Summ. J., at "Enclosure 'A'.") Plaintiff alleges that Ibarra did not reveal that he had diagnosed a hernia. Plaintiff was subsequently assigned to work in ICCC's kitchen. As part of his duties, plaintiff was required to lift bulk food packages, some of which plaintiff alleges weighed approximately eighty pounds.

On October 1, 1999, plaintiff was transferred to Staunton Correctional Center ("Staunton"). Upon intake to Staunton, defendant Dr. Hasin Ozinal gave plaintiff an initial examination. Plaintiff denied having a hernia at that time. Plaintiff was again assigned to work in the kitchen. Ozinal did not see plaintiff again. On August 8, 2000, Ozinal retired.

Plaintiff alleges that, since 1999, he has experienced occasional severe pain during bowel movements but did not mention it to anyone because he attributed the pain to eating too much cheese or not drinking enough liquids. Plaintiff has not alleged or produced evidence that such symptoms are associated with inguinal hernias.

On March 20, 2001, plaintiff was transferred from Staunton back to ICCC by bus. Prior to placing plaintiff on the bus, defendant Charlyne Broughman–Critzer, a transportation officer working for VDOC at Augusta Correctional Center, allegedly placed shackles around plaintiff's ankles, even though plaintiff advised Broughman–Critzer that shackles would not fit. Plaintiff alleges that he was forced to wear the shackles for the entire nine-hour bus trip to ICCC, despite the availability of "tie wraps," which could have been used without causing plaintiff pain. Plaintiff alleges that he suffers continuing injury from the March 20, 2001 bus transport.

Plaintiff also alleges that, upon arriving at ICCC, he attempted to bring his ankle injury to the attention of defendant Sally Casebolt, the intake nurse at ICCC. Without looking at plaintiff's ankles, Casebolt allegedly informed him that he would have to sign up for "sick call" if he desired medical attention. However, the intake report and questionnaire completed by Casebolt and signed by plaintiff on March 20, 2001, indicates that plaintiff said he had not received any recent injuries. (Mem. in Supp. of Aug. 29, 2003 Mot. for Summ. J., at Ex. "A".) [4]

Plaintiff alleges that he subsequently made two requests to be seen on sick call which went unanswered. After signing up for a third time, plaintiff was called down to receive medical attention for his feet and ankles, which were now swollen, numb, and tingling. The medical records show that plaintiff was seen at sick call on March 26, 2001, six days after arriving at ICCC.

Plaintiff alleges that, upon seeing him, Kendra Shaw, the triage nurse, was "visibly shocked" and indicated that she would schedule plaintiff to see a doctor. (Comal. at 5.) While he was speaking with Shaw, plaintiff noticed defendant Dr. LALANI McCann, then institutional physician at ICCC, sitting in her office. On hearing plaintiff's complaints, McCann allegedly rose to her feet to attend to plaintiff, but was stopped by defendant Cathy Couther, then head nurse at ICCC and responsible for scheduling doctors appointments, who told plaintiff that he would have to schedule an appointment to see the doctor. Plaintiff's medical records indicate that his ankles were swollen, but that capillary refill time in plaintiff's feet was good, as was

---

**4.** All subsequent references to plaintiff's medi-   cal records have been taken from this source.

his pedal pulse. The medical notes from March 26, 2001, indicate that Shaw referred plaintiff to see a doctor.

The medical records also indicate that on April 12, 2001, Dr. McCann examined defendant, noted the swelling, made an initial diagnosis of neuralgia/parenthesis,[5] and prescribed prednisone, a steroid. Plaintiff was scheduled for a follow-up visit two weeks later, and was seen by McCann on April 26, 2001. Discovering at the follow-up appointment that plaintiff's prescription had not been filled in the intervening two weeks, plaintiff alleges that McCann "went ballistic on the people responsible for ordering and dispensing" the medication and advised plaintiff that she would see him again once he received his prescription. (Comal., at 5.) The medical records indicate that McCann instructed Casebolt to locate plaintiff's prescription and to reorder it if necessary. Casebolt reordered the prednisone on April 26, 2001. Plaintiff alleges that it was several more weeks and numerous administrative complaints before he received his prescription.

On June 13, 2001, plaintiff was seen by defendant Keia Dodson, a prison nurse, because he continued to experience numbness in his feet. At that time, the medical records note that plaintiff's capillary refill time was slow and his pedal pulse weak. Plaintiff was seen the same day by McCann. Plaintiff alleges that McCann reevaluated plaintiff and changed her diagnosis of his condition from neuralgia/parenthesis to varicose veins. The medical records show that McCann prescribed spe-

cial support hose for plaintiff's ankles on June 13, 2001, and because the first stockings ordered for plaintiff did not fit correctly, McCann remeasured and reordered prescription stockings for plaintiff two additional times in the weeks following that appointment. Plaintiff complains that the stockings did not remedy the numbness and tingling in his feet and ankles.

Despite records of numerous consultations throughout late 2001 and 2002, plaintiff alleges that subsequent requests for treatment for his ankles were "ignored." On October 24, 2001, plaintiff filed a grievance with Health Services for VDOC. In the grievance, plaintiff complained that the medication (prednisone) prescribed by McCann on April 12, 2001, was never ordered and that, after his follow-up appointment on April 26, 2001, no further appointment had been rescheduled. On February 6, 2002, defendant P.A. Terrangi, the warden at ICCC, responded to plaintiff's grievance, determining that it was unfounded. Plaintiff appealed Terrangi's decision. (Mem. in Support of Oct. 28, 2003 Motion for Summary Judgment, at "Enclosure B.") On March 4, 2002, defendant Frederick Shilling, VDOC health services director, found that plaintiff's grievance was unfounded. (Id.) During this process, plaintiff allegedly also appealed to defendant Dr. Vernon Smith, who plaintiff alleges was then director of health services for VDOC.[6] Plaintiff also allegedly appealed to defendant Laurel Corners, assistant warden of programs at ICCC, who did not respond. There is no record of these appeals. (Sellers Aff. at ¶¶ 8–10.)

---

**5.** "Neuralgia" is simply a medical term for pain following the path of a specific nerve. National Institutes of Health, "Neuralgia," *MEDLinePlus Medical Encyclopedia,* available at http://www.nlm.nih.gov/medli neplus/ency/article/001407.htm# Definition (last visited Mar. 5, 2004). "Parenthesis" is the medical term for a tingling or burning sensation. National Institute of Neurological Dis-

orders and Stroke, "Parenthesis Information Page," available at http://www.ninds.nih.gov/hea lth_and_medical/disorders/paresthesia.htm (last visited Mar. 5, 2004).

**6.** It is unclear what Smith's title and position was at the time.

On May 30, 2002, plaintiff allegedly experienced blood in his urine. The medical records indicate that plaintiff was seen by McCann on June 12, 2002, and he reported this episode. McCann's June 12, 2002 entry in the medical records indicates that plaintiff stated at that time that he had not experienced blood in his urine since May 30, 2002. McCann noted that plaintiff did not have a fever and ordered that a sample of his urine be sent to the lab for testing.

Plaintiff reported to sick call again on July 19, 2002, complaining of blood in his urine. The nurse who examined plaintiff on that day referred him to McCann. On July 23, 2002, McCann again examined plaintiff. Her notes from that day indicate that she reviewed plaintiff's lab test results and thoroughly examined him. Plaintiff denied dyspepsia (chronic stomach pain), rectal pain, or discharge, but stated that he felt discomfort in his left flank on occasion. McCann ordered that additional lab tests be performed and that plaintiff be scheduled for a follow-up visit once those test results were in. McCann also issued certain "passes" to plaintiff so that he would not have to leave his cell except to shower. On July 24, 2002, plaintiff was seen by a nurse who conducted additional tests.

On August 5, 2002, plaintiff reported to sick call complaining of blood in his semen during a nocturnal discharge. On August 7, 2002, he was seen by McCann but her notes from that date are illegible. The medical records show that on August 20, 2002, plaintiff was transported to Southampton Memorial Hospital for an intravenous pyelogram ("IVP").[7] This test indicated that plaintiff's kidneys were entirely normal.

Sometime in July or August 2002, plaintiff became interested in being transferred to a work center or moving to work release. Under VDOC regulations, an inmate is eligible for transfer to a work center or to be put on work release only if his "work/activity code" is "A" or "B." Sometime during July or August 2002, a nurse allegedly told plaintiff his work/activity code was "D," due to a hernia. Plaintiff alleges that this is the first time he learned of his hernia. Plaintiff again signed up for sick call and was examined by McCann on August 16, 2002, at which time he informed her of his desire to have his classification changed. McCann did not change plaintiff's work/activity code at that time. On August 20, 2002, McCann noted that plaintiff's IVP results had returned normal.

On August 26, 2002, plaintiff had another appointment with McCann. At that time, McCann informed plaintiff that she could only change his code to "C," based on the presence of his hernia and his pericarditis (inflammation of the sac-like covering of the heart). When plaintiff asked to have an operation to repair the hernia, McCann allegedly informed him that, due to a recent email memorandum from defendant Schilling, plaintiff's condition would not be treated because it was not life-threatening. McCann allegedly prescribed that plaintiff not lift anything weighing over twenty-five pounds. Also at

---

**7.** According to the National Institutes of Health:

An intravenous pyelogram is performed by injecting contrast material into a vein in the arm. A series of x-rays are taken at timed intervals as the contrast material goes through the kidneys, the ureters (the tubes connecting the kidneys to the bladder), and the bladder. The procedure helps to evaluate the condition of the kidneys, ureters, and bladder.

National Institutes of Health, "Intravenous Pyleogram," *MEDLinePlus Medical Encyclopedia*, available at http://wwww.nlm.nih.gov/medlineplus/ency/imagepages/9481.htm (last visited Mar. 5, 2003).

the August 26, 2002 appointment, plaintiff again told McCann that he was experiencing frequent blood in his urine. McCann ordered a urinalysis, which came back positive for the presence of occult blood on October 3, 2002. Plaintiff alleges that he was scheduled for a follow-up appointment for September 20, 2002, but that appointment was cancelled and that he has continued to experience blood in his urine.

On October 18, 2002,[8] plaintiff filed a complaint in the above-captioned matter, seeking $4.5 million in damages and an injunction "requiring that the appropriate medical procedures be performed immediately by a hospital not affiliated with the Virginia Department of Corrections." (Comal. at 10.) Plaintiff amended his complaint on November 14, 2002, November 27, 2002, and April 23, 2003.[9] These amendments simply particularized plaintiff's claims against each defendant, except that in the April 23, 2003 amendment, plaintiff stated for the first time a claim against defendant Dr. Ehteshamul Haque.[10]

Haque was institutional physician at ICCC from November, 2002, to December, 2002. In his third amendment to the complaint, plaintiff alleges that, on November 14, 2002, Haque examined plaintiff and informed him that he could have his hernia operated on after serving his sentence. Plaintiff also alleges that Haque said he would attempt to treat the blood in plaintiff's urine, but that Haque did not take any steps subsequently to treat plaintiff. (Pl. Amend. 3, at 1.) According to Haque, however, based on "countless tests and evaluations" by himself and others, "[i]t was ultimately determined that [plaintiff] had no serious medical need." (Haque Aff. ¶ 2.) The medical records show that, on November 14, 2002, Haque ordered that another urinalysis be performed and also ordered a urine culture if the urinalysis was positive for blood. Haque ordered a follow-up medical appointment for six weeks later and, as requested, changed plaintiff's medical classification to 'A'. Haque left ICCC in December, 2002. The medical records indicate that through July, 2003, plaintiff was seen on numerous occasions by the institutional physician at ICCC and also on multiple occasions by a urologist. Several tests were also performed for the purpose of diagnosing and treating plaintiff, including a cystoscopy— a procedure that enables a doctor to see the interior lining of the bladder and urethra.

On August 25, 2003, defendants Terrangi, Corners, Keeling, Broughman–Critzer, and Schilling filed an answer to the complaint. On August 29, 2003, defendants Casebolt, Couther, Dodson, and McCann filed a motion for summary judgment (hereinafter, the "August 29, 2003 Motion for Summary Judgment") and documents in support of that motion. Also on August 29, 2003, in accordance with *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), and Local Rule of Practice 7(J) of the United States District Court for the Eastern District of Virginia, plaintiff was given notice of his opportunity to respond to defendants' motion with any material that he wished to file in rebuttal and was instruct-

---

8. The complaint was actually filed by the Clerk on November 6, 2002. Pursuant to the "prisoner mailbox rule" however, the court considers the complaint filed as of the date it was given to prison officials for mailing.

9. These pleadings are hereinafter cited as "Pl. Amend. 1.," Pl. Amend. 2," and "Pl. Amend. 3," respectively.

10. Plaintiff named "M.G. Haque" as a defendant in the third amendment to the complaint. It later became known that plaintiff was referring to Dr. Ehteshamul Haque.

ed that the failure to submit any materials could result in an adverse judgment based on defendants' motion and accompanying affidavits. On September 11, 2003, plaintiff filed a memorandum in opposition to the August 29, 2003 motion for summary judgment. On October 8, 2003, plaintiff filed an untimely affidavit in opposition to the August 29, 2003 motion. The time to file a reply to plaintiff's opposition has passed.

On September 24, 2003, defendants Ibarra and Ozinal filed a motion for summary judgment (hereinafter, the "September 24, 2003 motion of summary judgment"), documents in support of that motion, and sent *Roseboro* notice to plaintiff. On October 8, 2003, plaintiff filed a memorandum in opposition to the September 24, 2003 motion for summary judgment, as well as an affidavit in support of that opposition. On October 14, 2003, defendants Ibarra and Ozinal filed a brief in reply to plaintiff's memorandum in opposition to the September 24, 2003 motion for summary judgment.

On October 28, 2003, defendants Terrangi, Corners, Keeling, Broughman–Critzer, and Schilling filed a motion for summary judgment (hereinafter the October 28, 2003 motion for summary judgment"), documents in support of that motion, and sent *Roseboro* notice to plaintiff. On November 21, 2003, plaintiff filed a memorandum in response to the October 28, 2003 motion for summary judgment. The time to file a reply to plaintiff's opposition has passed.

On November 13, 2003, defendant Haque filed an answer. On November 17, 2003, the court ordered Haque to file a dispositive motion within thirty days if he wished to do so. On December 17, 2003, Haque filed a motion for summary judgment (hereinafter the "December 17, 2003 motion for summary judgment"), documents in support of that motion, and sent *Roseboro* notice to plaintiff. On January 12, 2004, plaintiff filed a memorandum in opposition to the December 17, 2003 motion for summary judgment. On January 15, 2003, Haque filed a reply brief.

Thus, all defendants have filed motions for summary judgment and evidence in support of those motions, to which plaintiff has responded. The motions are ripe for review.[11]

## II. Standard of Review

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA"),[12] requires a prisoner to fully exhaust "such administrative remedies as are available" before filing a § 1983 action in federal court challenging prison conditions. 42 U.S.C. § 1997e(a).[13] If the court determines based on the available evi-

---

11. On March 1, 2004, plaintiff filed a "Motion to File Supplemental Pleading," a two-page document that does not amend plaintiff's claims so much as it alleges two additional facts. First, it claims that on January 29, 2004, the institutional physician at ICCC determined that plaintiff should be seen by a specialist to conduct nerve conductor studies on his ankles. Second, plaintiff claims that at least 4 other inmates at ICCC have had their hernias operated on in the last several months. These allegations do not add to plaintiff's claims or alter the disposition of defendants' motions for summary judgment.

12. The Prison Litigation Reform Act of 1995, Pub.L. 104–134, 110 Stat. 1321–66 to 1321–77 (codified as amended in scattered sections of titles 11, 18, 28, and 42 of the United States Code).

13. In relevant part, 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

dence, and after plaintiff has had an opportunity to respond, that a prisoner-plaintiff has failed to exhaust the administrative remedies available to him, then the court must dismiss the suit without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1119–20 (9th Cir.2003) ("If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice."); *see also Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (holding that § 1983 suit cannot be brought until administrative remedies are exhausted, even if those processes do not allow for the awarding of the particular remedy plaintiff seeks). The court must do so even if pursuing available administrative remedies would be futile. *See Booth*, 532 U.S. at 741 n. 6, 121 S.Ct. 1819 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

### B. *Summary Judgment*

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24, 106 S.Ct. 2548. Such facts must be pre-

sented in the form of exhibits and sworn affidavits. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Failure by plaintiff to rebut defendant's motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

### III. *Analysis*

A. *Plaintiff's Claims Against Defendants Broughman–Critzer and Schilling Must Be Dismissed for Failure to Exhaust Administrative Remedies*

Irrespective of their merit, the claims against defendants Broughman–Critzer and Schilling must be dismissed without prejudice because plaintiff has failed to exhaust his administrative remedies against these defendants. VDOC Division Operation Procedure ("DOP") 866, "Inmate Grievance Procedure," sets forth the steps an inmate must follow and complete to exhaust his administrative remedies. First, the inmate must attempt to resolve the issue informally. If that attempt is not successful, there are three formal levels of review for prisoner grievances. Level I is conducted by the warden or superintendent of the prison where the inmate is located. The time limit for a Level I response is 30 days. If the inmate is not satisfied with the result of his Level I grievance review, or if no response to his Level I grievance is received within 30 days of its submission, the inmate has the

right to appeal the determination to Level II. Virginia Department of Corrections, "Inmate Grievance Procedure," DOP 866–716(4) (Nov. 20, 1998). Level II reviews are conducted by the regional director, health services director, or chief of operations for classification and records of VDOC. The time limit for a Level II response is 20 days. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Deputy Director or Director of the VDOC reviews the grievance.

The claims against Broughman–Critzer, the Augusta Correctional Center transportation officer, clearly must be dismissed because the undisputed affidavits and records put forth by defendant show that plaintiff never filed an administrative grievance against her. In an affidavit, Sandra Conner, human rights advocate at Augusta Correctional Center and custodian of inmate grievance files at that institution, states that she has reviewed Augusta's grievance files and "[t]here is nothing in our files to indicate that Lawrence filed any grievances regarding the officer from Augusta placing his shackles on too tightly during his transport from Staunton Correctional Center to Indian Creek Correctional Center." (Conner Aff. ¶ 8.) Conner states that, had any such grievance been filed at ICCC, it would have been forwarded to Augusta for the Level I response. Further, ICCC has no record of any such

grievances being filed. In an affidavit, Curley Sellers, treatment programs supervisor at ICCC and the custodian of inmate grievance files maintained at that institution, states that "[t]here is nothing in our files indicating that Lawrence filed any grievances against the Augusta Correctional Center officer." (Sellers Aff. ¶ 12.) Thus, on the basis of the evidence put forth by Broughman–Critzer, and in the absence of any allegation or proof that plaintiff attempted to exhaust his administrative remedies against her, plaintiff's claim against her must be dismissed without prejudice. *See Wyatt,* 315 F.3d at 1120.[14]

■ Similarly, plaintiff has failed to fully exhaust his administrative remedies against defendant Schilling, the health services director of VDOC and the claim against him must be dismissed. Plaintiff alleges that Schilling violated his Eighth Amendment rights by establishing a policy that no medical procedures that were not life-saving in nature were to be performed on inmates at ICCC, and that on this basis, plaintiff was denied adequate treatment for his hernia. However, the records indicate that plaintiff failed to exhaust ICCC's internal grievance process before filing his complaint. On September 13, 2002, plaintiff filed a Level I regular grievance form which, in relevant part, states that "I have asked to have this problem

**14.** VDOC DOP 816–7.14 requires that "[g]rievances are to be filed within 30 calendar days from the date of occurrence/incident or discovery of occurrence/incident." Thus, any future grievances plaintiff files regarding the incidents at issue in this case are almost certain to be denied as untimely. If plaintiff appeals these procedural denials to the point of exhaustion of his administrative remedies, however, then he may refile this § 1983 suit notwithstanding the fact that he failed to comply with VDOC's procedural requirements. *See Thomas v. Woolum,* 337 F.3d 720, 733 (6th Cir.2003) (holding that a state prison system's "decision not to grant relief in particular cases-whether for timeliness or for any other state procedural requirement-does not strip the federal courts of their power to do so," under § 1997e); *see also Oscar Mayer Co. v. Evans,* 441 U.S. 750, 758–61, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (holding under the Age Discrimination in Employment Act that failure to file administrative complaint within time limits prescribed by state civil rights commission did not bar federal action). Plaintiff is CAUTIONED, however, that the statute of limitations continues to run on his § 1983 claims.

[plaintiff's hernia] taken care of and was informed that I would not be able to get the proper medical attention because the only surgeries that would be authorized by the Virginia Department of Corrections were those that were of a life saving nature." (Mem. in Supp. of Oct. 28, 2003 Mot. for Summ. J., at "Enclosure 'C'.") Though the warden did not respond to this grievance until March 12, 2003, plaintiff had a right to appeal to Level II as of October 13, 2002.[15] Plaintiff failed to do so.[16] Therefore, plaintiff failed to exhaust his administrative remedy against Schilling, and the claim against him must be dismissed without prejudice. *See Wyatt*, 315 F.3d at 1120.[17]

B. *The Remaining Medical Defendants are Entitled To Judgment as a Matter of Law on Plaintiff's Eighth Amendment Claims*

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Courts use the Eighth Amendment to scrutinize the treatment a prisoner receives in prison and the conditions of confinement. To prove cruel and unusual punishment in violation of the Eighth Amendment, an inmate-plaintiff must satisfy a two-prong test that has both an objective and a subjective component. The first prong, which is an objective inquiry, asks whether the deprivation alleged is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). For prison conditions to run afoul of the Eighth Amendment, the inmate must be denied "the minimal civilized measure of life's necessities," *Wilson*, 501 U.S. at 298, 111 S.Ct. 2321, and the deprivation must violate the "contemporary standard of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

The second prong, a subjective inquiry, requires the inmate to demonstrate that the prison officials acted at least with deliberate indifference toward his or her needs. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970; *Wilson*, 501 U.S. at 302-03, 111

---

15. In fact, such an appeal likely would have been reviewed by Schilling. It is important to note that plaintiff has put forth no evidence that Schilling ever sent the alleged email memorandum.

16. Plaintiff also did not attempt to appeal the Level I response after March 12, 2003.

17. *But see Taylor v. Barnett*, 105 F.Supp.2d 483, 486 (E.D.Va.2000) (Brinkema, J.) (denying defendant's motion to dismiss on the basis of failure to exhaust available prison grievance procedures). The court in *Taylor* did not look beyond the pleadings and accepted plaintiff's allegation that DOP 866-715(1) "requires a written resolution of claims before the appeals process can be utilized." *Id.* The court held that "[i]f plaintiff's factual allegations are true, then it is clear that he had exhausted his 'available' administrative remedies as required by the PLRA." *Id.* First, as a matter of fact, DOP 866-715(1) says nothing about the availability of an appeal, and DOP 866-716(4) specifically provides that the right of appeal of a Level I response becomes available 30 days after the grievance is received by the warden. *See supra* text at 16-17. Thus, an appeal to Level II was "available" to the plaintiff in *Taylor* as it was to the plaintiff in this case, but plaintiffs failed to pursue that remedy. Second, even though dismissal without prejudice is the proper disposition where a prisoner has failed to exhaust administrative remedies, in determining whether to dismiss for failure to exhaust prison grievance procedures, "the court may look beyond the pleadings and decide disputed issues of fact." *Wyatt*, 315 F.3d at 1119-20. In this case, defendants provided the court with affidavits and authenticated records which plaintiff has not refuted in response, showing that plaintiff had the opportunity to appeal to Level II but failed to do so.

S.Ct. 2321. This subjective prong requires more than negligent conduct; deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 835–37, 114 S.Ct. 1970 (establishing a subjective recklessness standard for prison-condition cases); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

■■■ Deliberate indifference by prison medical staff to an inmate's serious illness or injury creates a cause of action under 42 U.S.C. § 1983 as cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir.1990). A plaintiff may demonstrate the deliberate indifference of the prison medical staff by either actual intent or reckless disregard. *Id.* "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Id.* at 851–52; *see also Mitchell v. Aluisi*, 872 F.2d 577, 579 (4th Cir.1989). Mere malpractice or negligence in diagnosis or treatment does not state a constitutional claim. *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285; *Miltier*, 896 F.2d at 852. Moreover, a prisoner's disagreement with medical personnel over the course of his or her treatment is not actionable. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985).

■■■ In addition to deliberate indifference and a serious medical need, in order to obtain money damages for unconstitutional medical care in a state prison, an inmate must produce evidence of serious or significant physical or emotional injury resulting from the challenged cruel and unusual prison conditions. *Strickler v. Waters*, 989 F.2d 1375, 1380–81 (4th Cir. 1993), *cert. denied*, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). Injunctive relief, however, is available in the absence of actual injury "to prevent a substantial risk of serious injury from ripening into actual harm," if the prisoner is able to establish that the prison personnel have been, and continue to be, "knowingly and unreasonably disregarding an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 845–46, 114 S.Ct. 1970.

### 1. Plaintiff's Claims Against Defendants Ibarra and Ozinal Arising from the Diagnosis of His Hernia Fail to Allege Serious Injury

■■■ Because plaintiff does not allege that Ibarra's and Ozinal's failure to inform him of his hernia in 1999 and 2000 resulted in serious injury, summary judgment as to those claims must be granted.[18] In addition to establishing that prison personnel acted with deliberate indifference to a serious medical need, to succeed on a § 1983 claim for violation of the Eighth Amendment, a prisoner must show that he or she suffered from a serious injury as a result of defendants' conduct. *See Strickler*, 989 F.2d at 1381. If the prisoner has not suffered any such injury, he "simply has not been subjected to cruel and unusual punishment within the meaning of Amendment." *Id.*

■■■ Here, plaintiff has not alleged that he has suffered any serious injury from

---

18. As plaintiff is no longer under the care of either of these defendants, any claim for in-

junctive relief against them is moot.

the alleged failure to inform him of his hernia.[19] Plaintiff instead alleges only that Ibarra's failure to inform him of his hernia showed a gross disregard for plaintiff's health because "the possibility existed, and still exists to this day, of me contracting gangrene or a resultant colostomy." (Comal., at 7.) Plaintiff further alleges that his hernia "has the *potential* to become a serious health risk." (*Id.* at 9) (emphasis added). Thus, plaintiff has failed to state a claim for damages against defendants Ibarra and Ozinal, and they are entitled to judgment as a matter of law.

### 2. Defendants McCann, Couther, Casebolt, Dodson, and Haque are Entitled to Judgment as a Matter of Law Because They Were Not Deliberately Indifferent to a Serious Medical Need

Along with their motions for summary judgment, all of the medical defendants submitted copies of plaintiff's medical records.[20] The content of the authenticated medical records submitted to the court by defendants is not challenged by plaintiff. These undisputed records show that none of the remaining medical defendants was deliberately indifferent to any of plaintiff's serious medical needs. Therefore, these defendants are entitled to judgment as a matter of law.

■■■ Plaintiff's only allegation against defendant Casebolt, the intake nurse at ICCC on March 20, 2001, is that she was deliberately indifferent when he arrived at ICCC because she "failed in her responsibility to provide medical screening by summarily dismissing plaintiff without so much as looking down to see the extent of the [ankle] injury." (Pl. Amend. 2, at 1.) The authenticated and undisputed medical records indicate, however, that during plaintiff's intake at ICCC, Casebolt completed an "Inmate Receiving Information" form, a questionnaire completed by the intake nurse with information provided by the incoming inmate. This form indicates that upon intake on March 20, 2001, plaintiff acknowledged a history of pericarditis, but denied any other health problems. At question 23, plaintiff specifically denied having "recently sustained any injuries of any kind." Both Casebolt and plaintiff signed this form, which at a minimum proves that Casebolt examined plaintiff long enough to complete a two-page form. The only relevant evidence plaintiff has come forth with as to this claim is a statement in the affidavit of William P. Martin, a former ICCC inmate, that on March 20, 2001, "[w]hen [plaintiff] came back from seeing the intake nurse, he was obviously angry. When I inquired to what happened, he told me that she refused to look at his ankles and told him he would have to sign up for sick call if he wished to have them looked at."[21] (Martin Aff. ¶ 8.) This

---

**19.** Plaintiff also does not allege that any of the defendants' actions caused his hernia.

**20.** Attached as exhibit 'A' to the August 29, 2003 Motion for Summary Judgment is a copy of plaintiff's medical records and charts through August 7, 2003, and accompanied, as exhibit 'B,' by the notarized affidavit of Debba Williams, the medical records custodian at ICCC, attesting to the fact that the copies are authentic. Attached as exhibit 'A' to the September 24, 2003 Motion for Summary Judgment is another copy of plaintiff's medical records and an affidavit from Williams, but

these records do not continue past February 6, 2001. The December 17, 2003 Motion for Summary Judgment was also accompanied by plaintiff's medical records, extended through the end of August 2003. However, these records where not authenticated. Therefore, they have not been considered by the court in determining defendants' motions for summary judgment.

**21.** The court notes that the second sentence of Martin's statement is also inadmissible hearsay.

statement does not create a disputed material fact. The undisputed medical record shows that Casebolt completed an intake form which plaintiff signed indicating that he was not in need of immediate medical attention. Moreover, even if plaintiff had a disagreement at that time about his need to immediately see a physician, that disagreement does not provide plaintiff with a cause of action. *Wright,* 766 F.2d at 849. Therefore, plaintiff has made no showing of deliberate indifference, and Casebolt is entitled to judgment as a matter of law as to the claim against her.

Against defendants Dodson and Couther, plaintiff claims that, as head nurse, each was responsible for medical screening, scheduling of sick call and doctor's appointments, and the ordering of medication, and "by failing to perform these duties, defendant was deliberately indifferent to the medical needs of the plaintiff." (Pl. Amend. 2 ¶¶ 7, 8.) Again, the undisputed medical records wholly refute these allegations, and plaintiff has offered no evidence to show that a genuine issue of material fact exists as to the level of care he received from Dodson and Couther. From March 20, 2001 through September, 2002, plaintiff was examined by a nurse twenty-three times. He was seen by McCann, the institutional physician, thirteen times. The only time plaintiff alleges that he did not receive his prescription immediately, in April, 2001, Couther immediately reordered the prescription on Dr. McCann's request. Against this evidence, plaintiff's bald assertion that his requests were "ignored" is insufficient to sustain his burden on motion for summary judgment. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

Plaintiff also claims that Couther was deliberately indifferent by denying him access to McCann on March 26, 2001, the first time plaintiff reported to sick call at ICCC. Again, plaintiff's claim fails because a mere disagreement between a prisoner and prison medical personnel about the proper course of treatment is not actionable. *Wright,* 766 F.2d at 849. The fact that plaintiff disagreed with Dodson's determination that he need not be seen immediately by a doctor does not, without more, supply the basis for an Eighth Amendment claim.

Defendant McCann is also entitled to judgment as a matter of law because the undisputed medical records show that she was not deliberately indifferent to plaintiff's health needs. As previously stated, in the eighteen months plaintiff was under her care, McCann examined him thirteen times. She diagnosed plaintiff's conditions, wrote numerous prescriptions, and ordered several tests. In response, plaintiff has offered only conclusory allegations. Thus, plaintiff has failed to show that there exists a material issue as to whether McCann's treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier,* 896 F.2d at 851. McCann is entitled to judgment as a matter of law.

Finally, plaintiff's claim against defendant Haque fails for the same reasons. Haque was the institutional physician at ICCC between November, 2002, and December, 2002. During this short tenure, Haque examined plaintiff only once, on November 14, 2002. Plaintiff claims that during that examination, Haque told plaintiff that he could have his hernia operated on after his release from incarceration and that he would "try to fix" the recurrence of blood in plaintiff's urine and semen. (Pl. Amend. 3, at 1.) Plaintiff alleges that Haque "did nothing to address any of the medical problems." (*Id.*) The undisputed medical records and the affidavit of Haque prove the contrary, however, and plaintiff has offered no evidence creat-

ing a genuine issue of material fact as to the element of deliberate indifference. The medical records show that, at the November 14, 2002, appointment, Haque ordered that another urinalysis be performed and also ordered a urine culture if the urinalysis was positive for blood. Further, Haque ordered a follow-up medical appointment for six weeks after November 14, 2002. At the time, Haque was of the medical opinion that plaintiff's hernia was not serious, and therefore, an operation to correct it was not warranted. (Haque Aff. at 5.) That Haque made this diagnosis is corroborated by the fact that on November 14, 2002, Haque changed plaintiff's medical code from "C" to "A." The Eighth Amendment does not require the court to evaluate the merits of this diagnosis. *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285. A disagreement by plaintiff over his diagnosis does not rise to the level of an Eighth Amendment violation. *Wright*, 766 F.2d at 849. Plaintiff has not met his burden to show that Haque might have acted with deliberate indifference, and Haque is entitled to judgment as a matter of law.

C. *Plaintiff Fails to State a Claim Against Defendants Terrangi, Corners, and Keeling Because there is No Constitutional Right to Access to Grievance Procedures*

▮ Plaintiff claims that defendants Terrangi,[22] Corners, and Keeling violated his due process rights by delaying or not responding to grievances plaintiff allegedly filed. However, there is no constitutional right to institutional grievance procedures. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) *cert. denied* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995). Therefore, state officials' delay in responding to or even failure to respond to such grievances is not, by itself, a violation of the Due Process Clause of the Fourteenth Amendment. Defendants Terrangi, Corners, and Keeling are entitled to judgment as a matter of law.

### IV. Conclusion

For the reasons stated, the claims against defendants Broughman–Critzer and Schilling are **DISMISSED** without prejudice to plaintiff's refiling after he exhausts all available administrative remedies. The motions for summary judgment of defendants Terrangi, Ibarra, Couther, Corners, McCann, Keeling, Ozinal, Casebolt, Haque, and Dodson are **GRANTED**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Final Order to plaintiff and counsel for defendants. Plaintiff is advised that he may appeal from this Memorandum Opinion and Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days from the date of this Order. If plaintiff wishes to proceed *in forma pauperis* on appeal, the application to proceed *in forma pauperis* is to be submitted to the Clerk, United States Court of Appeals,

---

**22.** Plaintiff also claims that Terrangi violated his Eighth Amendment rights because, in her role as warden, she is "ultimately responsible for plaintiff's care and maintenance." (Amend. 2, at 2.) This claim against Terrangi must be dismissed because non-medical prison personnel may rely upon medical personnel with respect to medical decisions. *See Lewis v. Angelone*, 926 F.Supp. 69, 73 (W.D.Va.1996). Supervisory officials are entitled to rely on the expertise of doctors in treating inmates and are not deliberately indifferent in failing to intervene in treatment. *Miltier*, 896 F.2d at 854–55. Moreover, to the extent that plaintiff is attempting to claim under a theory of *respondeat superior* liability, it is well-established that no such liability exists under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Fourth Circuit, 1100 E. Main Street, Richmond, Virginia 23219.

**IT IS SO ORDERED.**